JOHN W. KILLEN and MARY EVELYN KILLEN,
Complainants below, Appellants,

*vs.*

WILLIAM B. PURDY and FRANCIS A. PURDY,
Defendants below, Appellees.

*Supreme. Court, on appeal, June T.,* 1916.

In a suit to cancel a deed of plaintiffs' mill and dam and land contiguous thereto, which, with an agreement executed at the same time, constituted a mortgage, conditioned for plaintiffs' payment to defendants of the repairs made by defendants, evidence *held* to show that the deed and agreement were signed by plaintiffs.

In such suit evidence *held* not to clearly establish that the deed and agreement were obtained by fraud.

Fraud, when alleged as ground for the avoidance of a deed, must clearly be proved to avail the party charging it.

Under a deed conveying a mill, a dam, and about twenty-five acres of contiguous land for a consideration of $1,400, and a contemporaneous agreement which, with the deed, constituted a mortgage to secure plaintiff's payment of repairs to be made by the defendants, providing that, if the defendants expended $1,500, they would bear $200, and would bear $500 of the expense on the mill dam above $1,700, and in view of the defendants' intention to make the cost of repairs so great as to put it beyond the power of plaintiffs to pay therefor, and the fact that some of the repairs were outside the agreement, the plaintiffs would be entitled to a reconveyance without paying the entire cost of the repairs, and upon a finding of the part thereof for which they were liable.

APPEAL FROM COURT OF CHANCERY. The facts and contentions of the parties may be summarized as follows:

The appellants had been acquainted with William B. Purdy, one of the appellees, for several years, and during that period the said Purdy, together with certain of his friends from Philadelphia, constituting. the "Felton Fishing Club," frequently went to Felton and from there to the mill pond on the farm owned by John W. Killen, one of the appellants, for

the purpose of fishing for bass, with which fish said pond was stocked. Killen believed that Purdy and his friends were men of means and desirous of building a clubhouse at the pond and of making other expenditures and improvements there, in order to enjoy the fishing. Acting on such belief the appellants executed a ninety-nine year lease to the appellees, thereby granting to them the exclusive right to fish in said pond during the continuance of the lease for the annual sum of one dollar; and the appellees at the same time executed a lease to the appellants, granting to them the right to use sufficient water from the mill pond to operate the mill which was connected therewith.

About the same time, at the request of Purdy, it was agreed that a strip of land surrounding the mill pond should be conveyed by Killen and his wife to Purdy in order that his fishing rights might be fully protected, the consideration being fourteen hundred dollars. This contract was never consummated, Purdy claiming that after the dam was swept away by a high head of water on May 18, 1913, the said strip of land would be of no value to him and his friends because the fishing rights were destroyed. But on July 12, 1913, when the deed and agreement in controversy were executed, Purdy agreed that the time for the consummation of this agreement should be extended. On the evening of July 12, 1913, William B. Purdy and one Wilson, who was Killen's tenant, went to the home of Killen and his wife and remained there until about one o'clock that night. After a long talk about repairing the dam and the cost thereof, the deed and agreement in question were executed. The deed, executed by the appellant, conveyed the mill, the dam and about twenty-five acres of land contiguous thereto to William B. Purdy, and this deed, taken in connection with the agreement executed at the same time by the appellants and appellees, constituted a mortgage conditioned for the payment to the appellees of the cost of the repairs made to the dam by them which the appellants were legally bound under such agreement to pay. In the event of the failure of the appellants to pay for such repairs the title to the land conveyed by the deed was to become absolute in the grantee.

The relief sought by the appellants in the Court of Chancery was the cancellation and delivery up of said deed and agreement because the same were forged, or, if not actually forged, that the deed, was not knowingly executed by them, and if signed by them it was done under the belief that it was another paper; and as to the contract, it was contended that if the paper claimed to be the agreement contains the appellants' signatures, sheets prior to the signatures were substituted for original sheets, of a different character, after the execution of the agreement.

The appellees, on the other hand, contend that said deed and contract were both executed by the appellants with full knowledge of their contents, and that they are now in the same condition as they were at the time of signing without any changes, substitution of sheets or other alteration whatsoever.

The appellants also asked that the court below make an order directing an issue of fact to be tried by a jury at the bar of the Superior Court. This motion was denied by the Chancellor, and it was ordered and decreed by him that the bill of complaint filed in the cause be dismissed, and the restraining order dissolved.

The assignments of error are as follows: First, that the court erred in that it held and decreed that the bill of complaint be dismissed; and that the restraining order heretofore issued in the said cause be dissolved; and that the appellants pay the cost of this cause.

Second, that the court erred in that it held and ordered that the motion of John R. Nicholson and Alexander M. Daly, Esquires, solicitors for the appellants, for an order directing an issue of fact to a jury at the bar of the Superior Court, in and for Kent County, be denied.

For report of the case below, see *ante* p. 66.

Argued before PENNEWILL, C. J., and BOYCE, CONRAD, RICE and HEISEL, J. J.

Opinion.

*John R. Nicholson* and *Alexander M. Daly* for the appellants.

*W. Watson Harrington* and *Robert H. Richards*, for the appellees.

PENNEWILL, C. J. (after stating the facts, delivering the opinion of the court). Can the appellees retain title to the property conveyed to them by the deed of July 12, 1913, unless the appellants pay to the appellees about nine thousand dollars claimed to be the cost of repairing the mill dam?

The appellants insist that said deed was procured through fraud on the part of one of the appellees; that the papers they signed on the night of July twelfth, after a long meeting and discussion, were neither the deed referred to nor the agreement of the same date, which was made in connection with the deed.

The court are of the opinion, after a careful examination of the evidence, that both the deed and agreement must be held to have been signed by the appellants.

Fraud when alleged must be clearly proved to avail the party charging it, and especially is this so when it is sought to avoid a deed on that ground. We think the evidence fails to clearly establish the fact that the deed and agreement were obtained by fraud.

It is very probable that the appellants did not fully realize what the papers meant, and it is possible that being without counsel they were at a disadvantage in transacting such important business with a man as interested as William B. Purdy, and as familiar as he was with legal papers and business affairs. Evidently they relied upon his judgment, integrity and fairness to a large degree, and felt that their interests would not suffer at his hands.

Such a situation is not an uncommon one, and without expressing any opinion respecting Purdy's honesty and fairness in securing the appellants' signatures to the papers in question, we say the appellants were, in the eyes of the law, competent to take care of their own interests. They were not only able to read, but did read and discuss the papers they signed, and must be held to have understood the meaning and effect of

what they did sign. We think, therefore, the Chancellor was justified in refusing to order an issue to be tried by a jury.

But conceding that the deed and agreement of July 12, 1913, were the identical papers that appellants signed, and were not forged or procured by fraud in any way, the question remains: What is their legal meaning and effect? Was it the intention of the parties that the title to the property conveyed by the deed should become absolute in William B. Purdy, one of the appellees, if the appellants failed to pay him whatever sum he might choose to expend in repairing the dam, no matter how large it might be?

In the agreement made July 12, 1913, it is provided as follows:

"If the parties of the second part (Purdy, et al.) expend fifteen hundred dollars on said mill dam, they will bear two hundred dollars, and in any event they will bear five hundred dollars of said expense on said mill dam above seventeen hundred dollars, provided that the parties of the first part (Killens) keep all provisions hereinbefore mentioned."

The agreement contains also these words:

"The parties of the first part agree to pay to the parties of the second part all moneys expended by them for repairs to the said dam, mill and race within five years as above mentioned. Title to said property to remain in the said parties of the second part until payment is made in full."

It is impossible to tell exactly what the agreement means. The typewritten paper that the Killens were asked to sign would not be so difficult to interpret because it is general in its language and contains nothing which could be construed as a limitation upon the cost of the repairs, or the part the Killens would have to pay. It was for that reason no doubt that Purdy was required to insert the provision which is written in with pen, and which indicates very clearly that the parties when they signed the agreement believed the repairs would not in any event cost much more than seventeen hundred dollars. Of this amount the Purdys agreed to pay two hundred, and the remaining sum of thirteen hundred the Killens were liable for. This much is clear. And it is also clear that the parties

believed the cost of the repairs might exceed fifteen hundred dollars, and perhaps be above seventeen hundred. In that event the Purdys agreed to pay five hundred dollars of the cost in excess of seventeen hundred dollars.

But that which the court find it impossible to clearly discover from the agreement is, how much expense above seventeen hundred dollars Purdy had a right to incur, without Killen's consent? It being impossible to determine this question definitely from the letter of the agreement, the court would have the right, in reaching a conclusion to consider all the facts and circumstances touching the subject matter of the agreement at the time of its execution, so far as they are disclosed by the record.

Without referring specifically to the pertinent parts of the record we say it is impossible to believe that the parties thought or intended that the costs should be much above seventeen hundred dollars. It is inconceivable that the Killens might under the agreement have to pay nine thousand dollars for the repairs.

There are some circumstances preceding and following the execution of the agreement which tend to support the conclusion that Purdy could not have expected the Killens to pay the enormous expense of the repairs, that were being made under his supervision.

In the first place, when he found that the cost of the repairs would be far in excess of what the Killens had a right to believe they would cost, he would have informed Killen of that fact if he expected him to pay the bill. Any reasonable man would have done this, and Purdy's failure to do it is a circumstance which indicates that he did not expect the Killens to pay the excess cost. The only escape from this conclusion presupposes a purpose on Purdy's part that the court is loath to entertain, viz: That Purdy made the cost of the repairs so great as to put it out of the power of the Killens to pay the same and compel a reconveyance of the property which they had conveyed to Purdy as security for the repairs. We cannot think that Purdy created such great expense in order to obtain an absolute title to Killens' property without paying them anything for it.

In the second place it appears from the record that some of the repairs were outside the agreement. William B. Purdy, one of the appellees admitted this fact in his cross-examination. When asked, "Why did you take such small security for such extensive repairs?" he answered, "Do you mean the repairs in accordance with the contract, or do you mean the repairs that I actually have done? There are two lots of repairs to that dam, one was in accordance with the contract, and the other by compulsion to protect what I had already done."

Another fact of some significance is this: While Purdy endeavored to get a conveyance of Killen's entire farm of over two hundred acres as security for the repairs, he finally agreed to accept a deed for the mill property consisting of twenty-five acres only, and this, he testified, was worth about four thousand dollars after the repairs were made. He could not have intended that Killen would be required to pay more than the security was worth, which was not one-half as much as he demands that Killen shall pay in order to recover his property.

But even if the liability of the appellants was not limited by the agreement, the court are of the opinion that they could not be compelled to pay practically the entire bill for repairs because it is unfair. Many of the charges, particularly for the services of William B. Purdy and his son, and for railroad transportation, are manifestly excessive and unreasonable. A charge of forty dollars a week for himself, from twelve to twenty-one dollars a week for his son, and innumerable charges for railroad fare, covering a long period of time, a court of equity could not approve.

If the appellants are compelled to pay the entire repair bill, less five hundred dollars, in order to recover their property which was conveyed to Purdy as security, it is manifest that Purdy will own the property absolutely and the appellants get nothing at all in return. We cannot believe that the parties intended that the agreement should have such effect.

It would be equally unfair and inequitable to cancel the deed and agreement and thereby enable the appellants to recover their property and enjoy the benefit of the repairs and improvements without paying anything therefor.

The Chancellor in the concluding part of his opinion says:

"Inasmuch as it is admitted by all the parties that the instrument, though in form a deed, is in effect and substance a mortgage, and the appellants have at any time a right to enforce a reconveyance on showing a performance of their written contract made in connection with the deed, no harm can be done, etc."

This is, we think, a correct statement of the rights of the appellants in a general way.

We concur in the opinion of the Chancellor which holds that the evidence does not show that the deed and agreement of July 12, 1913, were procured by fraud, and that therefore they should not be cancelled. We further concur in his refusal to order an issue.

But while this court are of the opinion that the decree of the Chancellor should be affirmed, we are also of the opinion that the appellants are not required to pay the entire cost of the repairs to the mill dam as submitted by the appellees, in order to recover their property conveyed to William B. Purdy as security for the repairs. But what part of said repairs the appellants are required to pay under their agreement of July 12, 1913, must be determined in another proceeding before the Chancellor, because it is not an issue in this case.